# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

ROBERT F. BATTEN,

> Plaintiff,

-vs-                                                    Case No.  6:06-cv-1067-Orl-KRS

COMMISSIONER OF SOCIAL
SECURITY,

> Defendant.

_____

## ORDER

This cause came on for consideration without oral argument on the Complaint filed by Robert F. Batten, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. Nos. 10, 11.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c).  Doc. Nos. 19, 20.

## I.    PROCEDURAL  HISTORY.

In March 2003, Batten applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq*. (sometimes referred to herein as the Act).  R. 49-51.  The application alleged that Batten became disabled on January 7, 2003. *Id*.  Batten's applications were denied initially and on reconsideration. R. 28-33, 37-38.

Batten made a timely request for a hearing before an administrative law judge (ALJ). R. 40. An ALJ held a hearing on December 13, 2005. R. 537-67. Batten, represented by a person who was not an attorney, testified at the hearing. No other testimony was taken. *Id*.

After considering the testimony and the medical evidence presented, the ALJ determined that Batten was insured under OASDI through December 31, 2008. R. 14. The ALJ found that Batten had not engaged in substantial gainful activity since January 7, 2003, the alleged onset date of his disability. R. 14.

The ALJ concluded that the medical evidence showed that Batten was status-post neck surgery and had degenerative disc disease, which were severe impairments. R. 14. These impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).[1] R. 18. The ALJ also found that the following conditions were non-severe: carpal tunnel syndrome, hypertension, right rotator cuff impingement, anxiety, and depression. R. 16.[2] While the ALJ noted that Batten had been diagnosed with fibromyalgia, R. 16, the ALJ did not opine whether this impairment was severe.[3]

---

[1] The Code of Federal Regulations "contains a Listing of Impairments . . . specifying almost every sort of medical problem ('impairment') from which a person can suffer, sorted into general categories." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[2] Batten does not challenge these findings.

[3] Batten's representative did not argue at the hearing before the ALJ that fibromyalgia was a severe impairment.

The ALJ found that Batten had the residual functional capacity (RFC) to perform a full range of light work.[4] R. 18, 21.  In reaching this conclusion, the ALJ concurred with the opinions of the state agency reviewing physicians, as well as the opinion of Dr. Barber, a consulting physician.  R. 18.  The ALJ gave little weight to the opinion of Dr. Shea, a treating physician, finding that his opinion that Batten was disabled was inconsistent with the remainder of his report.  R. 18.  The ALJ also gave little weight to the opinion of Dr. Klein, a treating physician, finding that his opinion was inconsistent with Batten's activities of daily living and with Dr. Barber's report.  R. 19.

The ALJ found that Batten's "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but . . . [Batten's] statements concerning the intensity, duration, and limited effects of these symptoms are not entirely credible."  R. 18.  In support of this conclusion, the ALJ cited Batten's statements to his doctors, his inconsistent use of a cane, his activities with his dependent son, his discontinuation of muscle relaxants due to their interference with his social life, and other activities of daily living.  R. 18-19.

While Batten's past relevant work as a park ranger was generally a light-duty position, Batten previously performed it as a medium-duty position.  Therefore, the ALJ determined that Batten could not return to his past relevant work.  R. 20. The ALJ relied upon the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, to determine that there was

---

[4]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567.

work available in the national economy that Batten could perform.  Therefore, the ALJ concluded

that Batten was not disabled for purposes of the Act.  R. 21.

Batten requested review of the ALJ's decision. R. 7-8.  On May 26, 2006, the Appeals

Council issued a decision finding no basis to review the ALJ's decision.  R. 4-6. Batten timely

sought review of this decision by this Court.  Doc. No. 1.

**II.      JURISDICTION.**

The ALJ's decision became the final decision of the Commissioner when the Appeals

Council denied Batten's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir.

1998); 20 C.F.R. § 404.981.  Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

**III.     STATEMENT OF FACTS.**

*A.      Evidence from Batten.*

Batten was born on August 16, 1958.  R. 541.  He is 6' tall and weighed 187 pounds.  R.

63. While he did not graduate from high school, he received a high school diploma through a

community college program.  R. 70, 549.  He had previously served in the Army and received

some treatment through the Veterans Administration (VA).  R. 545, 549.

Batten had worked for the Seminole County parks department from 1988 until January

2003.  R. 65, 77, 85, 547.  He was a parks supervisor, and oversaw most park maintenance and

cleaning.  R. 65, 77, 85, 554.  In this position, he occasionally lifted up to one hundred pounds and

frequently lifted twenty-five pounds.  R. 65, 77, 85.  He supervised three-to-four-man teams.  R.

65, 77, 554.

In 2000, Batten had neck surgery.  R. 550.  It relieved the pain and pressure, but after hitting a pothole while riding in a vehicle as a passenger at work, his neck pain returned.  R. 559; *see also* R. 61-62 (letter from Batten written in 2003).  In April 2003, Batten was injured in a car accident, which further exacerbated his pain.  R. 549.   At the time of the hearing, Batten testified that he had constant spasms in his neck and back.  R. 561; *see also* R. 62.  If he turned his head too quickly, he sometimes had a blackout.  R. 561.

Batten had problems sitting or standing for extended periods because of neck and back pain.  R. 100, 551, 563.  He had visited the emergency room for back pain.  R. 559. He could usually only sit or stand for about ten or fifteen minutes at a time, and had to alternate positions. R. 557-58.  He could walk for about ten minutes with a cane.  R. 558.   His back and legs hurt after standing on hard surfaces, like at a grocery store.  R. 563.  His legs became "wobbly," and he had balance problems about once a month.  R. 563.  His back pain radiated through his legs to his feet, sometimes with tingling and numbness.  R. 563.

Batten also experienced migraine headaches, which had been exacerbated after the car accident.  R. 551.  Sometimes the headaches lasted for two or three days.  R. 551.

Batten had trouble lifting because of neck pain.  R. 551.  He frequently had trouble lifting a gallon of milk.  R. 558.  The neck pain radiated to his shoulders, and he experienced stiffness if he had to use his arms.  R. 561-62.  Working overhead exacerbated his pain.  R. 62.

He had carpal tunnel syndrome and experienced numbness, tingling, and burning in his hands.  R. 562.  *See also* R. 92 (describing pain).  He had trouble manipulating coins and other small objects.  R. 562-63.  His arms and hands fatigued easily.  R. 62.

Batten took a number of medications, including Cortef[5] and Methadone[6].  R. 552; *see also*

R. 69, 92 (listing oxycodone[7]); 120 (list of medications).  He also received different types of

injections, which initially helped but had become ineffective.  R. 552.  He had used a TENS unit

that had been effective relieving pain, but he lost this device in a house fire.  R. 564-65.  The

medications affected his mood.  R. 564.  He did not feel safe operating machinery because of the

medications.  R. 61, 64.  He was depressed about his conditions, and he received counseling. R.

109, 566.

Batten was divorced.  R. 545.  After his home was destroyed in a fire, Batten and his son,

who received benefits under the Supplemental Security Income for the Aged, Blind and Disabled

Program (SSI), lived with a friend.  R. 541-42.

Batten's son had developmental problems and was a slow learner, but could dress himself

and care for his personal needs.  R. 555.  Batten took him to the zoo, Sea World and other places,

but his son often required being in a stroller because his legs would give out.  R. 556.  In 2004,

Batten and his dependent son attended a family reunion in North Carolina for four days.  R. 560.

---

[5]  Cortef is the brand name for hydrocortisone, and is used in the treatment of inflammation, pain, and other conditions.  Medline Plus, *Hydrocortisone (Oral)*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682206.html (last visited Sept. 17, 2007).

[6]  Methadone is used to treat moderate to severe pain that is not relieved by non-narcotic pain relievers.  It is an opiate narcotic.  Medline Plus, *Methadone*, http://www.nlm.nih.gov/ medlineplus/druginfo/medmaster/a682134.html (last visited Sept. 17, 2007).

[7]  Oxycodone is used to treat moderate to moderate-to-severe pain.  Medline Plus, *Oxycodone*, http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682132.html (last visited Sept. 17, 2007).

Batten used to visit relatives and friends, but did so less frequently after his conditions developed. R. 108.

Batten had a driver's license and drove himself thirty minutes to the hearing.  R. 545.  He used to drive a motorcycle, but it was destroyed in the house fire.  R. 550-51.  He was able to dress himself and care for his personal needs.  R. 556.  Before the house was destroyed, Batten took care of all of the household chores, sometimes with help from neighbors.  R. 106-07, 556-57.  He went grocery shopping for himself and his son.  R. 557.  His friend's son, who also lived in the home, did the yard work.  R. 557.

B.      *Medical Records.*[8]

In October 1996, Batten was seen for migraines, severe neck pain, and left arm pain. Batten had mild limitation of rotation of the neck, but not spasms or problems with range of motion.  He was given medication for pain and problems sleeping.  R. 177-78.  Later in the month, an MRI of his cervical spine indicated protruding disc material at the C5-C6 level, with some osteophyte[9] formation.  The impression was degenerative changes of the cervical spine.  R. 121-23.

A year later, he was seen by Leticia Camacho-Mojica, PA-C (certified physician assistant), with charts reviewed by Reginald L. Tall, M.D., for "neck . . . and . . . back pain over the last 14

---

[8] There are medical records regarding referrals for depression and other mental health issues.  *See* R. 208-11; 212-25; 266-79.  The ALJ found that Batten's anxiety and depression were non-severe, and Batten does not challenge these findings here.  Therefore, I will not summarize the medical records regarding these conditions except as relevant to his physical conditions.

[9] "A bony outgrowth or proturberance."  STEDMAN'S MEDICAL DICTIONARY 1270 (26th ed. 1995) (hereinafter STEDMAN'S).

years." R. 175-76.[10]  He also reported severe headaches, shaking in his arms and hands, and a history of injections for pain. R. 175. Previous traction treatment no longer relieved his symptoms. R. 175. The impression was degenerative disc disease of the cervical spine, probable cervical spinal stenosis,[11] R. 176, and herniated nucleus pulposus C5-C6.[12] R. 173.

In November 1997, Gary M. Onik, M.D., examined Batten for complaints of neck pain radiating through his arms with numbness and weakness in his hands. R. 206. Dr. Onik observed that Batten's gait, strength and sensory abilities were normal. His diagnosis was a herniated disc at C5-6. R. 204-06. Dr. Onik and Andrew E. Cooperman, M.D., treated Batten with epidural steroid injections through 1999. R. 200-04. Batten reported good relief from the injections, but the pain ultimately returned. R. 200-03.

In October 1997, an MRI disclosed that Batten had "moderate signal level degenerative disc disease at C5-6" with disc herniation. R. 199. This was confirmed through an MRI of the cervical spine in November 1998. R. 196.

_____

[10]  The records of medical imaging reviewed by Camacho-Mojica and Dr. Tall, as well as records regarding the administration of various injections ordered at their request, are included in the record and cover a period between November 1997 and November 2001. R. 179-207.

[11]  Spinal stenosis refers to "a narrowing of the . . . spinal canal, which causes compression of the nerve roots." Medline Plus, *Spinal stenosis*, http://www.nlm.nih.gov/medlineplus/ ency/article/000441.htm (last visited Sept. 17, 2007).

[12]  Herniated nucleus pulposus "is a slipped disk along the spinal cord. The condition occurs when all or part of the soft center of a spinal disk is forced through a weakened part of the disk." Medline Plus, *Herniated nucleus pulposus (slipped disk)*, http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited Sept. 17, 2007).

In December 1998, Batten reported that his left leg dragged after walking for any length of time, and he had a loss of sensation in his left hand.  R. 166.  Nerve conduction and EMG tests performed in December 1998 revealed borderline to mild carpal tunnel syndrome in the left arm, with no evidence of cervical radiculopathy.  R. 159-60.  Beginning in at least October 1999, Batten experienced shaking in his arms, particularly during a migraine.  R. 155-57.  In November 1999, he declined surgical intervention after responding well to epidural injections.  R. 156.  He later continued to experience neck, arm and leg pain and headaches.  R. 153-55.

In March 2000, Batten underwent surgery to fuse the C5-C6 vertebrae.  R. 124-25 (surgical report); 151-52.  In April 2000, he mis-stepped on some stairs and heard a pop in his neck, despite using a cervical collar.  R. 149.  After the surgery, he initially experienced significant improvement in neck and upper back pain, but he continued to experience left shoulder and leg pain.  His ability to swallow improved. R. 148.  He was permitted to return to work as of June 2000.  R. 147.

In May 2000, Batten was admitted after being seen at the emergency room for left-side weakness, numbness, tingling, slurred speech, decreased facial movement, and difficulty swallowing.  R. 378-99.  The initial impression was transient ischemic attack.[13]  R. 387.  However, testing did not reveal evidence of hemorrhage or hematoma, R. 388, or abnormal cardiac function, R. 390.  The discharge diagnosis was left hemiparesis[14] of complicated migraine.  R. 383.

_____

[13]  A transient ischemic attack refers to a temporary disturbance of blood supply to an area of the brain that results in a sudden brief decrease in brain function. It is often called a mini-stroke. Medline Plus, *Transient Ischemic Attack (TIA)*, http://www.nlm.nih.gov/medlineplus/ency/article/000730.htm (last visited Sept. 17, 2007).

[14]  Hemiparesis refers to "[w]eakness affecting one side of the body."  STEDMAN'S at 775.

He later developed increased neck pain with exertion.  R. 145-46.  In August 2000, he reported right-sided neck pain and pain in his arms and legs.  R. 194-95.

In November 2000, after riding with his supervisor on bumpy roads, he developed increased neck pain and difficulty swallowing.  R. 144.  He complained of pain from head to toe.  R. 191.  The diagnoses were cervicalgia and dysphagia.  R. 142-43.

In February 2001, a barium swallow test revealed that Batten had normal swallowing function.  R. 190.

In April 2001, Batten continued to complain of neck and arm pain with numbness.  R. 135.  Colleen M. Zittel, M.D., found no electrodiagnosic evidence of cervical radiculopathy or other neuropathy.  R. 135.

In June 2001, Batten called 911 and was seen at the emergency room for shaking and breathing problems.  R. 372-74.  The condition appeared to be an anxiety attack.  R. 372.  However, a doctor later concluded that the condition was caused by an allergic reaction to Neurontin, a pain medication. *See* R. 132; *see also* R. 134 (record of June 2001 indicating continued problems swallowing).

Records throughout 2001 indicate continuing care for neck pain and other conditions.  R. 127-33.  Throughout his treatment, Camacho-Mojica varied his medications and dosages, and Batten received trigger point injections, which provided limited relief.  R. 132, 186-88.  In October 2001, Dr. Tall put Batten on indefinite no-work status.  R. 130-31.

In December 2001, James K. Shea, M.D., began seeing Batten for pain management at Dr. Tall's request.  R. 314-17.  Dr. Shea observed tenderness and reduced range of motion in the neck,

and reduced strength in the right deltoid area (4/5).  There was decreased sensation in both hands.

Batten had a normal gait.  R. 314-17. Dr. Shea treated Batten through at least November 2003.  R.

283-313.  Throughout this period, Dr. Shea adjusted Batten's medication to respond to pain.  *Id*.

In February 2002, Batten slipped on a wet floor and aggravated his back.  R. 312; *see also*

R. 368-70 (emergency room records).

In June 2002, Batten indicated to Dr. Shea that prolonged sitting or standing, bending,

lifting, and stooping aggravated his back pain, and he rated his overall pain as seven to eight on a

ten-point scale.  R. 308.  He could cook dinner and clean up afterwards.  R. 308.  In July 2002,

Batten indicated to Dr. Shea that he experienced trouble swallowing.  R. 307.

In January 2003, Dr. Shea put Batten on indefinite no-work status.  R. 301, 326.  In

February 2003, Batten reported pain of 8.5 on a ten-point scale, but reported feeling better since he

had stopped working, as he was able to focus on caring for his disabled son.  R. 300.

On April 4, 2003, Batten was involved in a motor vehicle accident.  R. 355-59 (emergency

room records); *see also* R. 294, 324.  The day after the accident, Batten was seen by Kenneth M.

Neigut, M.D.  R. 324-25.  Dr. Neigut's impression was soft tissue herniated nucleus pulposus at

C4-C5 with no cord compression or deformity, and "[b]road-based dorsal disc protrusion at C6-7

without evidence of cord compression or deformity.  Mild bilateral neural foraminal stenosis at

C6-7."  R. 325.  Ronald I. Landau, M.D., also saw Batten following the accident for neck and

shoulder pain.  Based on an MRI, the impression was rotator cuff impingement, R. 322, post-

surgical changes at C5-6, bulging disk at C4-5 and C6-7, "disk-osteophyte complex at C5-6" and

neural encroachment at C5-6 and C6-7.  R. 321.

Dr. Shea also saw Batten shortly after the accident. R. 292-98. Batten continued to have headaches, severe neck pain, and other pain. R. 295. He rated his pain between nine and ten on a ten-point scale. R. 295. He became light-headed when he walked, experienced stinging pain when water hit his skin in the shower, and had difficulty sleeping secondary to pain. R. 295. Upon examination, Batten had reduced range of motion in the neck and back, reduced right triceps strength (4/5), and decreased pin prick sensation in both hands. R. 296-98. The assessment was cervical and lumbar strain. R. 298. Dr. Shea indicated that a cane was medically necessary, and directed Batten not to work for two weeks (he had been released to work shortly before the accident) and to undergo physical therapy. R. 298. In a questionnaire completed in April 2003 for the SSA, Dr. Shea opined that Batten had normal posture and gait for short distances but used a cane in his left hand for stability when walking outside his house. He noted that Batten could not squat. R. 292. Later that month, Dr. Shea extended the no-work period for five weeks, and directed continued physical therapy. R. 293.

In May 2003, Batten saw Dr. Shea for continued pain, including neck pain so intense that he had trouble swallowing, numbness and tingling in his extremities, and other problems. R. 291. X-rays indicated minimal early degenerative changes with no fractures or dislocations of the lumbar spine. R. 291. Throughout June and July 2003, Batten experienced migraines, varying but high levels of pain, and had difficulty performing household chores. R. 286-90.

In June 2003, Batten was seen at the emergency room for right arm and shoulder pain. R. 351-54. He was released with instructions to follow up with Dr. Shea. R. 351. An MRI showed evidence of right shoulder rotator cuff impingement. R. 288. The MRI also showed evidence of

post-surgical changes at C5-6, disc bulging at C4-5 and C6-7, disc osteophyte complex at C5-6, and neural encroachment at C5-6 and C6-7.  R. 288.  Another MRI taken in July 2003 indicated mild disc bulging at L2-3.  R. 318-19.

During June 2003, Batten was seen by Leigh Scott Rosenberg, Psy.D., for a psychological evaluation.  R. 208-11.  He rode his motorcycle to the examination.  He carried a cane in case he needed it, but told Dr. Rosenberg that he rarely used it.  R. 208, 210.

In June 2003, Batten was also seen by Alvan Barber, M.D., at the request of the state agency.  R. 226-31.  Batten complained of chronic pain with loss of strength in his arms and hands, and headaches six times a week.  R. 226.  Batten entered the examination room using a cane.  R. 229.  Dr. Barber observed that Batten had a slow gait, and walked with difficulty with a right limp.  Batten could walk without using the cane; Dr. Barber wrote that the cane was not medically indicated.  Batten was unable to squat.  R. 229.  He had normal upper and lower extremity strength, and decreased range of motion in his neck, back and both upper and lower extremities.  He had decreased sensation in his hands, greater on the right than the left.  R. 228, 230.

Dr. Barber's impression was headaches, cervical degenerative disc disease with chronic pain and upper back spasms, and low back and leg pain secondary to a motor vehicle accident.  R. 229.  With respect to his functional ability, Dr. Barber concluded that Batten "is unable to walk, stand for long periods of time without complaints of body pain. [Batten] is unable to lift or carry heavy objects.  Symptoms could limit [Batten] to activities and occupation [sic] not requiring long

periods of standing, but possibly requiring use of upper body movements and coordinated

activities with hands." R. 229.

Beginning in July 2003, Batten was seen at the Pain Center of Orlando, under the care of

various doctors, including David S. Klein, M.D. R. 242-65, R. 491-97. At his initial evaluation,

Batten complained of gastroesophageal reflux, sleep disorder due to pain, and hypertension,

headaches, and other ailments. R. 251-52. Upon examination, Dr. Klein observed that Batten had

tenderness in his neck, but full range of motion. R. 253-54. He also had tenderness in his back,

and walked favoring the less painful side. R. 254. His diagnoses were as follows: sleep disorder

due to pain; gastroesophageal reflux disease, gastroesophagitis; fibromyalgia, pain of

fibromuscular origin[15]; reactive depression; post laminectormy syndrome, cervical with migraines;

and, cervical radiculopathy at the C-5 dorsal root with entrapment. R. 252, 254.

Batten received neural block injections from the Pain Center of Orlando on a monthly basis

from July 2003 through at least November 2004. R. 243-44; 246-47; 249; 411-15; 421-22; 430-

33; 435-39; 442-45; 448-50; 452-54; 457-59; 463-65; 468-70; 472-74; 483-84; 485-86. Batten

reported pain relief following the procedures. R. 244, 247, 249, 256.

In September 2003, Bharat Patel, M.D., observed minimal bulging at L4-L5 and

hemangioma[16] along the L1 vertebra, with no evidence of herniation. R. 259-60. After motor and

---

[15]  Fibromyalgia is characterized as long-term, body-wide pain in joints, muscles, tendons, and  other soft tissues. Medline Plus, *Fibromyalgia*, http://www.nlm.nih.gov/medlineplus/ ency/article/ 000427.htm (last visited Sept. 17, 2007).

[16]  A mass resulting from a proliferation of blood vessels. STEDMAN'S at 770.

sensory nerve studies, Lisa Banchik, M.D., also opined that Batten had cervical radiculopathy at C5-C6, bilateral median neuropathy, which was an early indication of carpal tunnel syndrome, and right median neuropathy below the elbow.  R. 262-63.  In October 2003, Dr. Banchik also diagnosed lumbar radiculopathy at the L5-S1 level, and bilateral tibial nerve neuropathy.  R. 489-90.

Between September and November 2003, Batten was seen by Dr. Shea on a regular basis. R. 283-85.  Batten rated his pain as averaging seven on a ten-point scale, increasing to ten at times. R. 285.  He had trouble sleeping.  R. 283. Dr. Shea observed that Batten was "unable to perform any household chores or participate in any recreational activities secondary to his pain."  R. 283. However, Batten stopped taking muscle relaxants because they were "interfering with his social life."  R. 283.  He also requested and received a prescription for Viagra.  R. 283; *see also* R. 518-20.  In December 2003, progress notes from the Pain Center of Orlando noted that Batten had decreased ability to perform activities of daily living.  R. 481.

In January 2004, Dr. Shea prepared forms at the request of the SSA.  Dr. Shea concluded that Batten could not squat, had decreased range of motion in the neck and back as well as decreased left ankle reflex, and required a cane to walk more than one hundred feet.  R. 280-82. Dr. Shea also prepared a Disability Evaluation and Report.  R. 476-80.  Dr. Shea observed that Batten continued to have headaches, neck pain, bilateral shoulder pain, bilateral arm and hand pain, numbness and tingling and low back pain; that he had trouble sleeping and awoke frequently because of pain; that he rated his pain as seven out of ten, up to ten at times; that he was unable to participate in any recreational activities; and that he was unable to return to work after the 2003

accident.  R. 476.  Dr. Shea observed palpable muscle spasms in the back.  R. 478.  "Based on the

5th edition of the AMA Guidelines, it is my opinion [that Batten] has a 10% whole person

impairment rating causally related to the 04/04/03 accident.  He has reached a point of maximum

medical improvement and will require ongoing medical care including physician visits, pain

medications, and periodic physical therapy during periods of exacerbation."  R. 480.  The 10%

impairment rating was based on both his cervical and lumbosacral problems.  R. 479.  *See also* R.

472-75 (progress notes from January 2004).

In February 2004, Batten reported increased pain after attempting yard work.  R. 471.

Later in the month, he was seen for migraine headaches and neck pain.  R. 467; *see also* R. 460-66

(similar records from March through April 2004).

In March 2004, unsigned records from the Pain Center of Orlando indicate that Batten

continued to complain of lower back pain, neck pain, and migraine headaches.  The impression

was status-post neck surgery, lumbar radiculopathy, and fibromyalgia.  R. 466.

In May 2004, Batten reported to Dr. Shea that "he is doing well except when he has to be

on his feet for any length of time, and driving for extended periods."  Dr. Shea observed that

Batten "remains disabled."  R. 337.  The same month, Dr. Shea prepared an Attending Physician's

Supplemental Statement, in which he indicated that Batten is "totally disabled" and had reached

maximum medical improvement.  R. 456.  He indicated that Batten could only sit for fifteen

minutes at a time, could be on his feet a total of three hours, could stand for ten minutes at a time,

and walk for five minutes at a time; could never bend, squat, stoop, kneel, or reach above his right

shoulder; and "cannot do any landscaping type work."  R. 456.  Furthermore, Batten was not a

candidate for further rehabilitation services.  R. 456.; *see also* R. 400-455 (progress notes from May 2004 through July 2005).

In July 2004, Dr. Klein observed sleep disorder, fibromyalgia, post laminectomy syndrome, and migraines.  R. 443.  In August 2004, Dr. Klein prepared a Medical Source Statement of Ability to Do Work.  R. 338-40.  Dr. Klein indicated that Batten could occasionally lift up to ten pounds and frequently lift less than ten pounds.  R. 338.  He indicated that Batten "[c]annot ambulate effectively on a sustained basis," and "[m]ust periodically alternat[e] sitting and standing to relieve pain or discomfort."  R. 338.  Pushing and pulling was limited in the lower extremities, and Batten could never crouch or crawl, and could only occasionally kneel.  R. 339.  He would also have occasional limitations on reaching and being around hazards such as machinery and heights.  R. 339-40.  Dr. Klein checked boxes indicating that Batten could not sustain work activity for an eight-hour workday with normal breaks, and that Batten's allegations of pain and were credible.  R. 340.

In August 2004, Batten was evaluated by someone at the Pain Center of Orlando whose signature is illegible.  R. 425-29.  The reviewer observed an antalgic gait, use of a straight cane, normal balance sitting and fair balance walking, some deficiencies in left hand strength, decreased shoulder range of motion, and decreased back range of motion.  R. 426-28. The assessment was that Batten could frequently lift up to five pounds and occasionally lift up to ten pounds.  R. 428.  He could frequently sit, and occasionally stand, walk, and kneel.  R. 428.

In November 2004, Dr. Klein observed that Batten was "continuing to improve," that "the pain comes and goes, now," and that Batten was "ambulating better, and with much less

discomfort." R. 412. However, he was maintained on an opiate for pain management, and Dr.

Klein opined that Batten was still severely impaired. R. 412-13.

In May 2005, Batten was seen at the emergency room for back pain. R. 345-50. He was

kept overnight and released the next day. R. 346. In June 2005, he was seen at the emergency

room for a migraine headache and released. R. 341-44; *see also* R. 400 (progress notes from Pain

Center of Orlando).

Records from the Veterans Administration between May and August 2005 indicate that

Batten was seen for neck and back pain, migraines, and various other conditions. R. 505-35.

Notable records indicate that imaging showed "degenerative changes – mild" in the back. R. 527.

C.      *Reviewing Professionals.*

In July 2003, Jim Takach, M.D., prepared a Physical Residual Functional Capacity

Assessment after a review of Batten's records. R. 232-39. Dr. Takach concluded that Batten

could lift twenty pounds occasionally and ten pounds frequently, and could stand, walk, and sit for

about six hours in an eight-hour workday. R. 233. He could never climb stairs, ladders, ropes, or

scaffolds, and could only occasionally climb ramps. R. 234. He also had occasional limitation on

balancing, stooping, kneeling, crouching, and crawling. R. 234. He should avoid even moderate

exposure to hazards such as machinery and heights. R. 236.

In February 2004, Daria F. Mananzini, M.D., prepared a Physical Residual Functional

Capacity Assessment at the request of the state agency after reviewing Batten's records. R. 328-

36. Dr. Mananzini concluded that Batten could occasionally lift twenty pounds and frequently lift

ten pounds, and could stand, walk, and sit for about six hours in an eight-hour workday. R. 329.

He could occasionally climb, balance, stoop, kneel, crouch, and crawl, but could never climb

ropes, ladders, or scaffolds.  R. 330.  He should avoid concentrated exposure to hazards. R. 332.

## IV.       STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI, a claimant must be unable to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" under the terms of

the Act is one "that results from anatomical, physiological, or psychological abnormalities which

are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

U.S.C. § 423(d)(3).  To be entitled to disability benefits under OASDI, the claimant also must

show that he or she became disabled before his or her insured status expired.  42 U.S.C. §

423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be

followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the

following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4).  An affirmative answer to any of the above questions leads to either

the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to

a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

   "The burden is primarily on the claimant to prove that he is disabled, and therefore entitled

to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir.

2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the

Commissioner[,] . . . [who] must produce evidence that there is other work available in significant

numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2

(citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

   A court's review of a final decision by the SSA is limited to determining whether the

ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*,

847 F.2d 698, 701 (11th Cir. 1988).

   The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C.

§ 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do

more than create a suspicion of the existence of the fact to be established. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."  *Walden v.

Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

   The court "must view the record as a whole, taking into account evidence favorable as well

as unfavorable to the [SSA's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the

court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court

may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption

attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating

claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if

the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient

reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health &

Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143,

1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a

judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause

for a rehearing."  42 U.S.C. § 405(g).

## V.    ANALYSIS.

Batten asserts four grounds supporting reversal.  First, that the ALJ erred in disregarding

the opinion of Dr. Klein that Batten was totally disabled.  Second, that the ALJ erred in not

discussing fibromyalgia.  Third, that the ALJ erred in his consideration of Batten's pain.  Fourth,

that the ALJ erred by failing to obtain vocational expert (VE) testimony.  These are the only issues

subject to review.[17]

The analysis of the first three assignments of error are intertwined.  In essence, Batten

contends that the ALJ erred in failing to accept the functional limitations arising from his pain,

---

[17] The parties were advised that issues not specifically raised would be waived.  Doc. No.
12 at 2.

-21-

which were acknowledged by all of the treating, consulting and reviewing physicians of record. This argument is well taken.

The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)). Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records." *Id*. (internal citations omitted). The ALJ must articulate the reasons for giving less weight to the opinion of the treating physician. *Id.* However, because the ultimate determination of disability for purposes of the Act is reserved to the Commissioner, conclusions by a treating physician that a claimant is "disabled" are not binding on the Commissioner. 20 C.F.R. § 404.1527(e)(1); *see also Miller v. Barnhart*, 182 Fed. Appx. 959, 964 (11th Cir. 2006); *Hurley v. Barnhart*, 385 F. Supp. 2d 1245, 1255 (M.D. Fla. 2005).

"[I]n certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)). To evaluate allegations of pain, the ALJ must apply the pain standard, which "'requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" *Foote*, 67 F.3d at 1560 (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)). If proof of a disability is based upon subjective evidence and a credibility determination is critical to the decision, "'the ALJ must either explicitly

discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" *Foote*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983)).

The record reveals that Batten had many impairments that reasonably could cause the pain and other subjective symptoms he reported.  Drs. Shea and Klein, both of whom treated Batten over extended periods, observed muscle spasms, tenderness and other objective indicia supporting Batten's complaints.  They credited these complaints, as shown by the extensive treatment with pain medication, nerve blocks and epidural steroid injections.  While the ALJ is correct that there are indications in the record that these treatments helped Batten to function, his reported activities do not equate with the ability to perform sustained gainful activity.  *Cf.* 20 C.F.R. § 404.1572 ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.").  Consequently, Dr. Shea and Dr. Klein opined that Batten was unable to engage in sustained activity necessary to return to employment.[18]

Even assuming that good cause existed for the ALJ not to rely on the opinions of the treating physicians, it is improper for an ALJ to substitute his opinion in place of the opinions of every medical expert. *See, e.g., Marbury*, 957 F.2d at 840.  In the present case, the ALJ purported to give controlling weight to the opinions of Dr. Barber, who examined Batten only once, and the

---

[18]  While Batten alleges a disability onset date of January 7, 2003, the record reflects that he was released to return to work sometime between January and April 2003, but this status ended with exacerbation of his impairments as a result of the April 2003 motor vehicle accident.  This does not preclude a finding of disability, however, because Batten was insured under OASDI through 2008.

reviewing physicians in reaching the conclusion that Batten could perform the full range of light

work. Yet, the ALJ did not accept all of the limitations cited by these physicians. Dr. Barber

opined that Batten could not walk or stand for long periods. As noted above, light work often

requires a great deal of walking and standing. *See also* Soc. Sec. Ruling 83-10, 1983 WL 31251.

The ALJ did not explain why he concluded that Dr. Barber's limitation in this regard was

consistent with the ability to perform light work.

Similarly, the reviewing physicians opined that Batten would have postural limitations and

should avoid exposure to hazards such as machinery and heights. The ALJ did not explain why he

did not accept the reviewing physicians' opinions regarding these nonexertional limitations. This

violates the requirement that, "[i]n assessing the medical evidence in this case, the ALJ was

required to state with particularity the weight he gave the different medical opinions and the

reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). The error is not

harmless because such nonexertional impairments could preclude reliance on the Grids at step five

of the sequential evaluation process. *See Marbury*, 957 F.2d at 839.

Because the record is not fully developed, remand rather than an award of benefits is

appropriate. On remand, the ALJ should assess the functional limitations arising from all of

Batten's impairments. If the ALJ concludes that Batten has nonexertional impairments, he must

determine whether Batten can perform a wide range of work at a given exertional level despite

these impairments. *See Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir. 1982)(remanding for

consideration whether a claimant's non-exertional impairments significantly limited his basic work

skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*, 461 U.S. 952 (1983),

*adhered to on remand, Broz v. Heckler*, 711 F.2d 957 (11th Cir. 1983), *modified in other respects*,

721 F.2d 1297 (11th Cir. 1983). This finding must be supported by substantial evidence, *Foote*,

67 F.3d at 1559, and can be drawn from suitable sources such as the *Dictionary of Occupational*

*Titles* or from the testimony of a VE, *Welch v. Bowen*, 854 F.2d 436, 439-40 (11th Cir. 1988).  If

the ALJ finds that Batten has nonexertional impairments that preclude a wide range of work at a

given exertional level, he should call upon a VE at step five of the sequential evaluation to

determine whether there is work available in the national economy that Batten can perform. *See*

*Phillips v. Barnhart*, 357 F.3d 1232, 1243 (11th Cir.  2004).

**VI.     CONCLUSION.**

        For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is

**REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further

proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and,

thereafter, to close the file.

        **DONE** and **ORDERED** in Orlando, Florida on September 17, 2007.

                                        *Karla R. Spaulding*
                                        KARLA R. SPAULDING
                                        UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party